Filed 1/26/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RYAN ODOM,<br><br>        Defendant and Appellant. | A140281<br><br>(Solano County<br>Super. Ct. No. VCR211543) |

INTRODUCTION

Keith Osby was beaten, hog-tied, and shot in the head because defendant Ryan Odom believed he stole a PlayStation from her. She appeals from her conviction of first degree murder and torture, claiming no substantial evidence supports the torture findings and the trial court erred in its instructions regarding the kidnapping and torture special circumstances. She also asserts she is entitled to one additional day of custody credit, which the Attorney General does not dispute.

We conclude there was instructional error due to a conflict in the language of the standard CALCRIM instructions where, as here, a kidnapping with intent to kill special circumstance finding is sought under Penal Code section 190.2, subdivision (a)(17)(M).[1] We also conclude, however, the error was harmless in this case, including because the jury found true the special circumstance that the murder was intentional and involved torture under section 190.2, subdivision (a)(18). We further conclude the verdicts are supported by substantial evidence and therefore affirm the judgment, as modified to provide one additional day of custody credit.

_____

[1] All further statutory references are to the Penal Code.

1

## FACTUAL AND
## PROCEDURAL BACKGROUND

On May 13, 2011, police responded to a call that the body of a male, later identified as Keith Osby, had been found in the bushes of the Masonic Lodge in Vallejo. Neighbors had heard a gunshot the night before, some time between 11:30 p.m. and 12:30 a.m.

Osby's hands were tied and bound with duct tape behind his back, a bloodied blindfold covered his eyes, and he had a gunshot wound to his head. There was broken duct tape around his ankles, and there were adhesive marks on his face, ears, mouth, and the back of his head. Osby was dressed in jeans but wore no shirt or shoes. There was a pool of blood under his head, and he had "significant injury to his face and nose area." His right eye was swollen shut, and his right shoulder was bruised and discolored.

Susan Hogan, M.D., a forensic pathologist, performed an autopsy. She noted Osby's hands were deep red-purple and swollen below the binding, indicating he had been alive when he was bound. In addition to abrasions and contusions, he had a "railroad track injury," with two parallel contusions, which was consistent with "being struck with something cylindrical such as a baseball bat or police baton." She concluded the cause of death was "gunshot wound to the head, and blunt force trauma to the torso." Osby had suffered massive hemorrhaging in the peritoneum, but no major artery or vein had been compromised. This indicated a "crushing injury," sheering "lots and lots of little tiny vessels." Dr. Hogan explained "[t]here [is] no way of stopping the bleeding from a crush injury." Even had Osby not been shot in the head, in her opinion he would have died from the blunt force trauma.

Paul Herrmann, M.D., a forensic pathologist testifying for the defense, testified Osby died of the gunshot wound to the head. In his opinion it was "hard to say" whether the internal bleeding "contributed at all" to Osby's death, and he believed Osby would not have died from internal bleeding had he not been shot.

The incident precipitating Osby's death was the theft of a PlayStation III and a computer from defendant and her brother, Frank Bigoski. Defendant and Bigoski lived in

a house with many other residents, including Crystal Odom (Crystal),[2] Crystal's two sisters, Tina and Tenaya Odom, and Crystal's two minor brothers.[3] A number of other people stayed intermittently at the house, including defendant's boyfriend Khalil Askari-Roberts (Khalil), Tina's boyfriend DaMarcus Armstrong and her best friend Jennifer Whittington, and Janiel Miller, a friend of Bigoski's. Osby, a former boyfriend of Tina's, also occasionally stayed at the house.

Defendant and Bigoski were angry about the theft of the electronics and believed Osby was responsible. A neighbor had reported that two men, one of whom apparently matched Osby's description, had entered the house and left with "some stuff." Jeremy DeRemer, a friend of Osby's, told defendant Osby tried to sell him a PlayStation and laptop.

Whittington testified defendant had several conversations with her about the theft of the PlayStation and how angry she was about it.[4] As a ruse to get Osby to come to her house, defendant asked Whittington to call him and ask if he wanted to participate in a robbery and "get a cut." Whittington called, but Osby declined the offer. Defendant told Whittington to call him back and tell him he could just be the driver. Osby agreed to that proposal.

Osby and his brother arrived at defendant's house around 4:00 p.m. on May 12. Defendant hugged both of them, which she later told Whittington was to pat them down. Crystal then told Osby "not to go in the bedroom because [defendant] was still mad about

---

[2] Crystal described defendant as her "mother," although she was not her biological mother. Crystal had been adopted by Harry Odom, her biological uncle, with whom defendant had been in an 11-year relationship. When the two separated, Crystal stayed with defendant, who became her legal guardian in 2009.

[3] Given their common last names, we refer to some of these individuals by their first names.

[4] Whittington testified pursuant to a plea agreement under which she would plead no contest to being an accessory to murder after the fact and would serve three years in prison in exchange for her truthful testimony.

3

the Play Station" and thought he had stolen it. Osby denied stealing it and said the Odoms "were like family to him."

Osby's brother left after about 25 minutes, and Whittington, who had recently taken the drug ecstasy, walked into one of the bedrooms with Osby. Defendant, Khalil, Tina, Bigoski, Miller, and Armstrong were already there. Crystal testified that after Osby went into the bedroom and shut the door, she heard an "automatic thumping noise against the door," like "somebody was trying to get out."

Whittington testified defendant began punching Osby with her fist "[r]ight as the door closed." Whittington then blacked out, and when she "blacked back in," Osby was "kind of crouched in the corner, and [defendant], Tina Odem and Khalil were all over him," hitting him. Whittington again blacked out, and when she came to, Osby was lying on the floor on his back with defendant standing over and straddling him. Defendant was yelling, "You want to steal from our kids and have my daughter out there 'ho'ing.' " Osby kept saying "Naw, mom, I'm not,"[5] and denied stealing the electronics. Defendant and Tina both kicked him, and Whittington noticed blood on the floor. She felt sick to her stomach and left the room. Whittington went into defendant's bedroom, where Crystal had taken the younger children.

Approximately 10 to 15 minutes later, defendant and Tina went to defendant's bedroom and asked Crystal for tape, then returned to the bedroom Osby was in. Whittington was very upset, and Crystal told her to stop being hysterical because she was scaring the children. Defendant also told her to calm down and "quit acting stupid," and instructed her to stay out of the bedroom in which Osby was being held.

Miller, another resident of the house, testified he knew "an assault . . . was going to take place," but he "didn't expect [Osby] to end up dead." At one point, Miller saw Bigoski leave the room, get a baseball bat, and hit Osby with it. Bigoski then accidentally hit defendant with the bat, and she told him to get rid of it. After that,

---

[5] The residents of the house called defendant "Mom." She was "in control" of the house, and Whittington did what defendant told her to do.

4

defendant "kicked [Osby] a couple of times and then punched him a couple of times, and she got tired." Bigoski, Armstrong, and possibly Khalil were holding Osby down while defendant was hitting and kicking him. Other than Bigoski hitting Osby one time with the baseball bat, the "only person that [Miller] remember[ed] seeing doing anything as far as violence like that was [defendant]." Osby kept saying, "Why would you do this to me, Mom?" Defendant "started getting emotional," and Armstrong told her, "You need to get out of here."

Osby tried to escape out the window, but Armstrong and Bigoski prevented it. Tina brought in some duct tape, and Osby "got taped, basically, hog tied." Miller explained, "What I mean by hog tied, his hands were tied behind his back and his feet were behind his back taped."

Sometime later, Crystal went to the bedroom "to check with everyone." She saw Osby "tied up on the floor." His arms were tied behind his back, and his feet were tied with a white rag. He had duct tape "around his whole head" and covering his mouth and "was beat up really bad." It appeared he had a broken nose, and his face was "really swollen," his eye was swollen shut, he had lumps on his head, and was bleeding and crying.

Crystal saw the duct tape had been removed from Osby's mouth, and Janiel was giving him some water. Osby was crying and asking to be released. Crystal saw spots of blood on defendant's shirt. She told defendant they should let Osby go, but defendant said "If we let him go, then he will come back and retaliate."

Defendant then went next door and told the neighbor she had to "handle something" and was looking for a car to "drop somebody off someplace," "dump him someplace." [6] Defendant told her the person had been beaten up at her house, she had thrown the first punch, and after that, "everything went bad." The neighbor "told

---

[6] The neighbor later testified she had been "mistake[n]" when she testified defendant said she needed to "dump" Osby somewhere and claimed that she did not remember ever testifying at the 402 hearing that defendant said she needed to "get rid" of Osby.

[defendant] if it was that bad, that she needed to take pictures so she [would] have proof that he left her house alive." Defendant told her neighbor she was worried about retaliation.

Defendant returned to her house, went back to the bedroom, and then came out on the front porch where Whittington was sitting, asking whether Whittington knew anyone who had a car they could borrow. When Whittington said no, defendant had her call a cab. She called the Fairfield taxi company where Khalil worked. Defendant then went to the taxi company with Armstrong. Defendant and Armstrong discussed what to do with Osby, and defendant said, "What do you mean, don't even trip. You got this idiot tied up at my house. I could get in trouble. I've got kids in my house, and you just want to leave him in there?" She suggested they throw Osby off a bridge, and told Armstrong he needed to "take care of it."

After defendant left, Crystal went back to the bedroom, where Osby was leaning against a couch and crying. The tape had been removed from his mouth, and Osby said if they let him go he would not retaliate. Crystal told him he would have to wait for Armstrong to return, because he "was in charge of the room." Whittington was also there and helped Osby smoke a cigarette and gave him some water. It looked to Whittington "like his nose was broken and one of his eyes [was] real puffed up and swollen to the point he could barely open it, and his lips were swollen."

Tina then called defendant because Whittington was "being too nice" to Osby. After getting defendant on the line, Tina handed the phone to Whittington. Defendant "yelled" at Whittington, "[You] don't fucking listen," and told her to stay out of the room. Osby remained bound in the room for at least two and a half hours.

A few hours later, between 10:00 and 11:00 p.m., a taxi van driven by Armstrong arrived at the residence. Armstrong and Bigoski picked up the bound-and-blindfolded Osby and lifted him into the back of the van. They also loaded Osby's shoes, shirt, sweater, and hat into the van, and Armstrong drove away.

Defendant reappeared at her house around 6:00 a.m. the following day. Crystal talked to her because she was upset that defendant had put "everybody else at risk over a

6

Play Station and a computer." Defendant admitted "beat[ing] the crap out of [Osby]," and told Crystal that Armstrong drove Osby to Richmond and shot him in the back of the head. Crystal saw a metal baseball bat on the floor of the room where Osby had been held.

Defendant told Whittington "that things got out of control, that they took proper action and that we just needed to go and act normal." Defendant said if the police came, Whittington should say Osby came to the house because she and Osby were supposed to go to Fresno, but he came and left. Defendant went "over the story" with the residents of the house.

A few days later, when Whittington learned Osby had been killed, defendant told her she needed "to keep [her] mouth shut and say what she told [her] to say when the police come. If not, it's not hard feelings. [She] was going to be handled, too." Whittington understood this to be a threat, meaning "if [she] didn't cooperate, that [she] would be killed like [Osby]." When initially questioned by police, Whittington, out of fear, recounted the story defendant had instructed her to tell.

Defendant was interviewed four times by police. Each time, she changed her description of the details surrounding Osby's beating. She admitted directing Whittington to have Osby come to the house and admitted intending to "smack" him if he lied about the alleged theft of the PlayStation. She acknowledged Osby's hands were duct taped. She initially told police the beating lasted 45 minutes but later said it was only 10 to 15 minutes.

In her final interview, defendant told police she had been looking for Osby for days before May 12. She was angry and planned to "sock the shit out of him" if he lied about taking the PlayStation. When Osby walked into the bedroom, defendant "called him a bastard" and "slapped" him twice in the face. She admitted telling Khalil he should throw Osby off a bridge but told police she did so "to lighten up my own mood at that point." She denied telling anyone to kill Osby but admitted her comment to Armstrong that "you need to take care of it" could have been misconstrued.

7

A jury found defendant guilty of torture (§ 206) and first degree murder (§ 187, subd. (a)).  It also found true the special circumstances of kidnapping with intent to kill (§ 190.2, subd. (a)(17)) and intentional murder involving the infliction of torture (*Id.*, subd. (a)(18)).

## DISCUSSION

A.      *The Torture Conviction and Torture Special Circumstance Finding*

Defendant contends no substantial evidence supports her torture conviction or the torture special circumstance finding.

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt.  We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt.  [Citation.]  We neither reweigh the evidence nor reevaluate the credibility of witnesses.  [Citation.]  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence.  [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).)

1.      The Torture Conviction

Section 206 defines the crime of torture as follows:  "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture.  [¶]  The crime of torture does not require any proof that the victim suffered pain."

Defendant maintains there is insufficient evidence of torture because "the beating involved a brief explosion of violence, not a cold and calculated attempt to inflict severe

8

and prolonged pain." She further claims there is insufficient evidence to "prove [she] had the specific intent to inflict cruel or extreme pain and suffering" because "Osby's visible wounds were not severe," "[t]here was no controlled, cold-blooded infliction of injuries to maximize Osby's pain," "[p]ain was not inflicted over a long period of time," and defendant "made no statements supporting the inference she wanted to torture Osby."

"Courts have interpreted intent to inflict 'cruel' pain and suffering as intent to inflict extreme or severe pain. [Citation.] Absent direct evidence of such intent, the circumstances of the offense can establish the intent to inflict extreme or severe pain. [Citations.] [¶] A jury may consider the severity of the wounds in determining whether defendant intended to torture." (*People v. Burton* (2006) 143 Cal.App.4th 447, 452.) "The intent to torture 'is a state of mind which, unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the circumstances surrounding the commission of the offense [citations], which include the nature and severity of the victim's wounds.' [Citation.] 'We have, however, cautioned against giving undue weight to the severity of the wounds' [citation]; severe injuries may also be consistent with the desire to kill, the heat of passion, or an explosion of violence." (*People v. Mungia* (2008) 44 Cal.4th 1101, 1137, italics omitted.)

"[Penal Code] section 206 does not require permanent, disabling, or disfiguring injuries; '[it] only requires "great bodily injury as defined in Section 12022.7". . . . "Abrasions, lacerations and bruising can constitute great bodily injury." ' [Citations.]" (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.) Moreover, as the court in *People v. Hamlin* (2009) 170 Cal.App.4th 1412 explained, "no single act in the perpetrator's course of conduct may result in great bodily injury. But where the cumulative result of the course of conduct is great bodily injury, and the requisite intent can be found, then the crime of torture has been committed . . . ." (*Id.* at p. 1429.)

Ample evidence supports defendant's torture conviction. She had been trying to find Osby "for a couple days" and orchestrated a ruse to lure him to her house for the admitted purpose of grilling him about the theft of the PlayStation and "sock[ing] the shit

9

out of him" if he lied about taking it. Defendant and her cohorts ambushed Osby as he entered the bedroom. She admittedly struck the first blow and continued punching and kicking him for some 45 minutes.[7] Osby was bleeding profusely, one eye was swollen shut, and his face was a battered mess. Defendant then had him "hog tied" and gagged with duct tape, and he was left tied up in the room, bleeding and crying.[8] When Whittington gave Osby some water and a cigarette, defendant "yelled" at her for being too "nice" to him. Defendant also described such a graphic situation to her neighbor that the neighbor told her to take photographs to prove Osby was still alive when he left defendant's house. Indeed, Osby suffered such massive internal injury he would have bled to death, even had he not been shot. Defendant and Armstrong, who defendant had seen with a gun sometime "earlier in the week or a couple of weeks" then went to the taxi company where Khalil worked. Defendant and Armstrong discussed what to do with Osby, and defendant suggested they throw Osby off a bridge and told Armstrong he needed to "take care of it." The next day, she told Whittington they had taken "proper action" because they did not want Osby retaliating. She later told Whittington to keep her mouth shut or she would be "handled too."

Defendant cites to cases upholding torture findings in more egregious circumstances and concludes "there is no precedent for upholding a torture conviction based on the assault with fists and feet." Torture, however, does not require a specific modality. It requires the infliction of great bodily injury with the "intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206) There is no question there are cases in which the acts of torture were more gruesome. However, "[w]hen we decide issues of sufficiency of

---

[7] Only later did she claim that the beating was for a shorter period of time.

[8] "Although evidence of binding, by itself, is insufficient to establish an intent to torture [citation], it is appropriate to consider whether the victim was bound and gagged, or was isolated from others, thus rendering the victim unable to resist a defendant's acts of violence [citation]; [*People v. Proctor* (1992) 4 Cal.4th 499, 532, . . .] ['victim was isolated and prevented from resisting or escaping' "]. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1188.)

10

evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) Here, there is no dispute Osby suffered great bodily injury (indeed, fatal injuries), and the purpose of its infliction was revenge for his allegedly stealing the electronics. That the great bodily injury was inflicted with "fists and feet" does not negate the substantial evidence of intent to cause cruel or extreme pain and suffering.

    2.      The Torture Special Circumstance Finding

Defendant contends the torture special circumstance finding is not sustainable because "there was insufficient evidence [she] intended to kill Osby when the beating was inflicted." She claims the evidence showed, at most, that she did not decide to kill him until after the beating.

Section 190.2, subdivision (a)(18) provides in relevant part: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found . . . to be true: [¶] . . . [¶] (18) the murder was intentional and involved the infliction of torture." " 'To prove a torture-murder special circumstance, the prosecution must show that defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.' " (*People v. Hajek and Vo, supra,* 58 Cal.4th at p. 1187, citing *People v. Streeter* (2012) 54 Cal.4th 205, 237, disapproved on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.)

Defendant's argument founders on the premise the torture consisted solely of the brutal beating. Osby was tortured through a course of conduct that did not end with the last blow. Not only was he pummeled and kicked for approximately 45 minutes, but then he was gagged and hog-tied, and thereafter, still hog-tied, was imprisoned in the bedroom, crying and slowly bleeding to death. Osby remained there for a minimum of two and a half hours before he was tossed into the van along with his clothes. He was still trussed up when his body was discovered. Thus, the jury could well have found a course of conduct whereby Osby was tortured over a sustained period of time. (See

11

*People v. Bemore* (2000) 22 Cal.4th 809, 842-843 ["we believe the Legislature, by employing the broader language of section 190.2, subdivision (a)(18), intended to encompass (within the torture-murder special circumstances) acts of torture occurring within a larger time frame, including those that would not have caused death"]; *People v. Hamlin, supra,* 170 Cal.App.4th at p. 1429 ["where the cumulative result of the course of conduct is great bodily injury, and the requisite intent can be found, then the crime of torture has been committed"].)

Further, given the severity and duration of the beating, there was substantial evidence from which the jury could have concluded defendant formed the intent to kill during the beating itself, even if there was no evidence she had that intent at the outset. The severity of the beating and defendant's anger increased as the beating went on, to the point where Armstrong told defendant she needed "to get out of here." Defendant then went to a neighbor and described the incident in such graphic terms the woman recommended defendant take photographs of Osby to prove he was still alive when he left her house. Defendant, in turn, told her she needed a car to "dump him someplace."

Unlike the crime of murder by torture (§ 189), there is no requirement that the act of torture supporting a special circumstance finding caused the victim's death. "Proof of a murder committed under the torture-murder special circumstance requires (1) proof of first degree murder, (2) proof that the defendant intended to kill and torture the victim, and (3) proof of the infliction of an extremely painful act upon a living victim. [Citation.] The torture-murder special circumstance thus is distinguished from first degree murder by torture in that it requires defendant to have acted with the intent to kill and applies where the death *involved* the infliction of torture, regardless of whether the acts constituting the torture were the cause of death." (*Jennings*, *supra*, 50 Cal.4th at p. 647, italics added.)

In *Jennings,* the defendant and his wife (mother) began abusing their son in mid-December 1995. (*Jennings*, *supra*, 50 Cal.4th at p. 628.) Mother admitted "sock[ing]" the child between the eyes and knocking him out. On Christmas day, a witness saw the child with his hand bandaged and was told the boy burned himself by touching the wood

stove.  About two weeks later, the same witness saw the boy with a bruise "from the hairline down to the jaw line."  Another witness saw the boy in early January looking " 'pretty beat up,' " with two black eyes, a bandaged hand, and an undernourished appearance.  (*Ibid.*)  In mid-January, while the defendant and mother were at the Child Protective Services' office about a report they had made about a neighbor's child, mother asked if the social worker could find an adoptive home for their son.  (*Id.* at p. 629.)  About two weeks later, mother gave their son sleeping pills and Valium at defendant's request.  (*Id.* at p. 640.)  Later that day, when mother was not home, defendant "grabbed [their son] and struck him on the back of his head with a fireplace shovel."  (*Id.* at p. 629.)  The boy died within an hour.  (*Ibid.*)

On appeal, the defendant challenged the torture special circumstance finding on the ground there was insufficient evidence of his intent to kill.  Rejecting his argument, the Supreme Court explained he was "focusing entirely on [mother's] allegedly innocuous intent in giving [their son] sleeping pills," whereas the "[t]he relevant inquiry" was *"whether defendant harbored an intent to kill when he tortured [his son]."* (*Jennings, supra,* 50 Cal.4th at p. 647, italics added.)  Moreover, "[t]he nature of the torture inflicted upon [his son]—the continuous infliction of serious and possibly life-threatening physical injuries while deliberately and systematically starving [him] to the point of emaciation—[was] sufficient to suggest that defendant had such intent."  (*Ibid.*)

Defendant focuses on the italicized language, arguing it requires evidence she "intended to kill Osby while she was beating him."  She also, again, myopically and mistakenly, focuses on the beating.  As the next sentence in *Jennings, supra,* 50 Cal.4th at p. 647 makes clear, torture can consist of a course of conduct and the intent to kill need not be conjoined with every act within that continuum.  Moreover, as we have discussed, given the severity and duration of the beating, there was substantial evidence from which the jury could have concluded defendant formed the intent to kill Osby during the beating.

13

Accordingly, the torture special circumstance finding is also supported by substantial evidence.[9]

B.      *The Kidnapping Special Circumstance Instructions*

Defendant challenges the kidnapping special circumstance on the ground the instructions erroneously allowed a finding based on reckless indifference to human life, rather than intent to kill. We agree there was instructional error due to conflict in the language of the standard CALCRIM instructions, which fail to take into account the language of section 190.2, subdivision (a)(17)(M). We further conclude, however, this did not result in prejudicial error in this case.

1.      The Instructions Misstated the Intent Requirement

Section 190.2, subdivision (a)(17)(B) provides in relevant part: (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, [¶] . . . [¶] (B) Kidnapping in violation of [s]ection[s] 207, 209, or 209.5." Subdivision (a)(17)(M) states, in turn: "To prove the special circumstance of kidnapping in subparagraph (B), or arson in subparagraph (H), if there is specific intent to kill, it is only required that there be proof of the elements of those felonies. If so established, those two special circumstances are proven even if the felony of kidnapping or arson is committed primarily or solely for the purpose of facilitating the murder."

Section 190.2, subdivisions (c) and (d) provide: "Every person, not the actual killer, who, with intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4." (§ 190.2, subd. (c).) "Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to

---

[9] Defendant's claim that the instructions on the torture special circumstance were flawed because "the evidence demonstrated [she] had no intent to kill when she beat and kicked Osby" fails for the same reason. (Boldface and solid capitalization omitted.)

human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found true under Section 190.4." (§ 190.2, subd. (d).)

Section 190.2, subdivisions (a)(17)(M), (c), and (d) are statutory responses to judicial decisions on two different issues.

Subdivisions (c) and (d) were added to section 190.4 in 1990 by Proposition 115, which limited the decision in *People v. Anderson* (1987) 43 Cal.3d 1104. (See *People v. Mil* (2012) 53 Cal.4th 400, 408-409.) In *Anderson*, the Supreme Court revisited its decision in *Carlos v. Superior Court* (1983) 35 Cal.3d 131, in which it had held intent to kill was required to sustain any felony-murder special circumstance. The Court concluded in *Anderson* that this was not an essential element as to a defendant who is the actual killer, but it remained an element as to a defendant who was an accomplice. (*Anderson,* at p. 1147.) Subdivision (c) essentially codifies *Anderson*'s holding as to accomplices, providing that a defendant who is not the actual killer but who, "with the intent to kill," aids and abets "any actor in the commission of murder in the first degree" is subject to the death penalty or life without the possibility of parole "if one or more of the special circumstances enumerated in subdivision (a) has been found true." (§ 190.2, subd. (c).) Subdivision (d), however, modifies the intent to kill requirement for accomplices for purposes of the *felony-murder* special circumstance, providing that "[n]otwithstanding subdivision (c)," a defendant who is not the actual killer, but who "with reckless indifference to human life and as a major participant" aids and abets "the commission of a felony enumerated in paragraph (17)" which results in death, and who is found guilty of first degree murder, is subject to the death penalty or life without the possibility of parole if any of the felony-murder special circumstances is found true. (*See People v. Estrada* (1995) 11 Cal.4th 568, 575 [Proposition 115 "eliminated the former,

15

judicially imposed requirement that a jury find intent to kill in order to sustain a felony-murder special-circumstance allegation against a defendant who was not the actual killer"].)

CALCRIM's introductory special circumstances instructions, Nos. 702 and 703, spell out the differing intent to kill requirements for defendants who are actual killers and those who are accomplices. The first, CALCRIM No. 702, is entitled "Special Circumstances: Intent Requirement for Accomplice After June 5, 1990—*Other* Than Felony Murder (Pen. Code, § 190.2 (c))." (Boldface omitted; italics added.) Not only does this instruction not pertain to a felony-murder special circumstance, but it pertains only to those other special circumstances that do not include an *explicit* intent to kill requirement and essentially supplies one.[10] Accordingly, CALCRIM No. 702 was not given here since the instant case involves only a felony-murder special circumstance and the torture special circumstance which contains an explicit intent to kill requirement.

The second CALCRIM introductory instruction, No. 703, is entitled "Special Circumstances: Intent Requirement for Accomplice After June 5, 1990—*Felony Murder* (Pen. Code, § 190.2 (d)). (Boldface omitted; italics added.) This instruction requires

---

[10]  CALCRIM No. 702 states:  "If you decide that (the/a) defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance[s] of <insert only special circumstance[s] under Pen. Code, §[] 190.2(a)(2), (3), (4), (5) or (6)>, you must also decide whether the defendant acted with the intent to kill.  [¶]  In order to prove (this/these) special circumstance[s] for a defendant who is not the actual killer but who is guilty of first degree murder as (an aider and abettor/ [or] a member of a conspiracy), the People must prove that the defendant acted with the intent to kill.  [¶]  [The People do not have to prove that the actual killer acted with the intent to kill in order for (this/these) special circumstance[s] to be true.  [If you decide that the defendant is guilty of first degree murder, but you cannot agree whether the defendant was the actual killer, then, in order to find (this/these) special circumstance[s] true, you must find that the defendant acted with the intent to kill.]  [¶]  If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that (he/she) acted with the intent to kill for the special circumstance[s] <insert only special circumstance[s] under Pen. Code, §[] 190.2(a)(2), (3), (4), (5) or (6)> to be true. If the People have not met this burden, you must find (this/these) special circumstance[s] (has/have) not been proved true [for that defendant]."  (Italics and boldface omitted.)

16

identification of the special circumstance felony and specifies that if the defendant is guilty of first degree murder but is not the actual killer, the jury must find he or she acted with intent to kill *or* with reckless indifference to human life and was a major participant in the felony.[11]  This instruction was given and is discussed further below.

Turning back to the statute, subdivision (a)(17)(M) was added by legislation passed in 1998, which became effective after voter approval (as Proposition 18) in 2000. The express intent was to create a statutory exception to the "independent purpose" requirement that had been established in cases like *People v. Weidert* (1985) 39 Cal.3d 836 and *People v. Green* (1980) 27 Cal.3d 1, overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 239.  (Stats.1998, c. 629; *People v. Brents, supra,*

---

[11]  CALCRIM No. 703 states: "If you decide that (the/a) defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance[s] of <insert felony murder special circumstance[s]>, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life.  [¶]  In order to prove (this/these) special circumstance[s] for a defendant who is not the actual killer but who is guilty of first degree murder as (an aider and abettor/ [or] a member of a conspiracy), the People must prove either that the defendant intended to kill, or the People must prove all of the following:  [¶]  1.  The defendant's participation in the crime began before or during the killing;  [¶]  2.  The defendant was a major participant in the crime; AND  [¶]  3.  When the defendant participated in the crime, (he/she) acted with reckless indifference to human life.  [¶]  [A person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death.]  [¶]  [The People do not have to prove that the actual killer acted with intent to kill or with reckless indifference to human life in order for the special circumstance[s] of <insert felony-murder special circumstance[s]> to be true.]  [¶]  [If you decide that the defendant is guilty of first degree murder, but you cannot agree whether the defendant was the actual killer, then, in order to find (this/these) special circumstance[s] true, you must find either that the defendant acted with intent to kill or you must find that the defendant acted with reckless indifference to human life and was a major participant in the crime.]  [¶]  If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that (he/she) acted with either the intent to kill or with reckless indifference to human life and was a major participant in the crime for the special circumstance[s] of <insert felony murder special circumstance[s]> to be true.  If the People have not met this burden, you must find (this/these) special circumstance[s] (has/have) not been proved true [for that defendant]."  (Italics and boldface omitted.)

17

53 Cal.4th at pp. 608-609, fn. 4.) *Weidert* and *Green* had held "where an accused's primary goal was not to kidnap but to kill, and where a kidnapping was merely incidental to a murder but not committed to advance an independent felonious purpose, a kidnapping-felony-murder special circumstance finding cannot be sustained." (*Weidert*, at p. 842; *Green*, *supra*, at pp. 47-62.) New subparagraph (17)(M) eliminated the independent felonious purpose requirement for both kidnapping and arson felony murder special circumstances. (*People v. Brents* (2012) 53 Cal.4th 599, 608-609, fn. 4.) Thus, after the enactment of subparagraph (M), even if a kidnapping or arson is committed primarily for the purpose of facilitating a murder, the special circumstance may be found true. (*Ibid.*)

In light of subparagraph (17)(M), CALCRIM provides three specific felony murder instructions. The first, CALCRIM NO. 730, is entitled "Special Circumstances: Murder in Commission of Felony (Pen. Code, § 190.2(a)(17))." (Boldface omitted.) This instruction requires, inter alia, that the defendant had intended to commit or had aided and abetted the commission of the specified felony. It also provides optional language that the intent to commit or aid and abet the felony must have existed before or at the time of the murder, and additional optional language that "[i]f you find that the defendant only intended to commit murder and the commission of [the felony] was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved." (Boldface omitted.) Thus, the latter language preserves the "independent purpose" requirement of *Weidert* and *Green*.

The other two specific CALCRIM instructions, Nos. 731 and 732, are the same, except one pertains to kidnapping and the other to arson. Because we are concerned with a kidnapping special circumstance, we focus on CALCRIM No. 731. That instruction is entitled "Special Circumstances: Murder in Commission of Felony—Kidnapping With Intent to Kill After March 8, 2000 (Pen. Code, § 190.2(a)(17))." It begins by stating "[t]he defendant is charged with the special circumstance of intentional murder while engaged in the commission of kidnapping" and requires, inter alia, that the defendant have either committed or aided and abetted a kidnapping, intended to have committed or

18

aided and abetted such kidnapping, and "intended that the other person be killed." Optional language provides, "[i]f all the listed elements are proved, you may find this special circumstance true even if the defendant intended solely to commit murder and the commission of kidnapping was merely part of or incidental to the commission of the murder." (Boldface omitted.)

Bench Note to CALCRIM No. 731 (Fall 2015 rev.) page 465 explains that section 190.2, subparagraph (17)(M) "eliminates the application of . . . *Green* . . . to intentional murders during the commission of kidnapping or arson of an inhabited structure." The notes also suggest subparagraph (M) is not clear as to whether the defendant, or only the actual killer, must have intended to kill the victim and states the instruction has opted to require intent to kill by both.[12] Since the purpose of subparagraph (M) was to overrule *Green*'s independent purpose requirement and create special circumstance liability where kidnapping and arson *are* incidental to the murder or, stated another way, where the murder is accomplished *by way* of kidnapping or arson, we agree both the actual killer and the accomplice must have the intent to kill.

The Bench Notes additionally state that CALCRIM No. 731 may be given alone or with No. 730 (the instruction setting for the general independent purpose/not incidental to the murder requirement). Thus, CALCRIM appears to recognize that a special circumstance finding can be made under subparagraphs (B) and (H), apart from subparagraph (M)—i.e., where the defendant did *not* have the intent to kill, but aided and abetted a kidnapping or arson for a purpose independent of or concurrent with the murder *and* acted with reckless indifference to human life and was a major participant in the

_____

[12] CALJIC, by comparison, expresses no such uncertainty and simply refers to the subdivision (a)(17)(M) special circumstance as "Murder in Commission of Kidnapping/Arson *With Intent to Kill*." (CALJIC No. 8.81.17.1, boldface and solid capitalization omitted; italics added.)

19

kidnapping or arson.[13] Only No. 731was given in this case. Thus, the sole felony-murder special circumstance considered by the jury was that set forth in *subparagraph* (*M*), which applies only when the defendant "intended that the [victim] be killed." (CALCRIM No. 731.)

We now turn back to the CALCRIM introductory instruction that was given— No. 703, entitled "Special Circumstances: Intent Requirement for Accomplice After June 5, 1990—Felony Murder (Pen. Code, § 190.2(d)). (Boldface omitted.) As discussed, this introductory instruction reflects the 1990 narrowing of *People v. Anderson, supra,* 43 Cal.3d 1104 by Proposition 115, which added both subdivision (c) [codifying *Anderson's* intent to kill requirement for accomplices] and (d) [modifying that intent to kill requirement for felony-murder special circumstances and allowing a finding based on reckless indifference to human life by a major participant in the qualifying felony]. (See *People v. Estrada*, *supra*, 11 Cal.4th at p. 575.)

The first sentence of CALCRIM No. 703 calls for identification of the qualifying felony. So, here, the first sentence of the instruction given reads as follows: "If you decide the defendant is guilty of first degree murder but was not the actual killer, then when you consider the special circumstances of <u>kidnapping</u>, you must also decide

---

[13] The CALJIC felony-murder instructions expressly treat subdivision (M) as creating a new special circumstance, in addition to the special circumstances set forth in subdivisions (B) and (H). The first instruction, No. 8.81.17, is entitled "Special Circumstances—Murder in Commission of _____" (boldface and solid capitalization omitted) and pertains to all listed felonies in subdivision (a)(17), *except* kidnapping and arson committed after March 8, 2000. It articulates the general independent purpose/not incidental to the murder requirement. The second instruction, No. 8.81.17.1, is entitled "Special Circumstances—Murder in Commission of Kidnapping/Arson With Intent to Kill [¶] (Penal Code, § 190.2, subdivision (a)(17)(M))." Thus, this instruction treats paragraph M as an independent felony murder special circumstance. "When there is no specific intent to kill, murder during kidnapping or arson would presumably be subject to the death penalty if the requirement of independent purpose (see CALJIC No. 8.81.17) is established. When both possibilities are before the jury, this new type of felony murder special circumstance could be referred to as murder in the commission of arson or kidnapping with intent to kill." (Use Note to CALJIC No. 8.81.17.1 (fall 2015 rev.) p. 727.) (Boldface and solid capitalization omitted.)

whether the defendant acted with either . . . the intent to kill or with reckless indifference to human life." (Underlining denotes blank filled in by trial court.) The instruction then went on to tell the jury "the People must prove *either* that the defendant intended to kill, *or* the People must prove all of the following" (i.e., that the defendant participated in the crime before or during the killing, that the defendant was a major participant in the crime and that the defendant acted with reckless indifference to human life). (Italics and boldface added.) The instruction further stated that "[i]f the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that she acted with *either* intent to kill *or* with reckless indifference to human life and was a major participant in the crime for the special circumstances of *kidnapping* to be true." (Italics added; trial court added "kidnapping.") The either/or language of No. 703 would have been correct *if* the prosecution had sought a special circumstances finding under *both* subparagraphs (17)(B) and (M), *and* the jury had been told these were two different special circumstances and had been instructed on both—i.e., given No. 730 as to (17)(B) [original kidnapping felony-murder special circumstance], and No. 731 as to (17)(M) [intent to kill kidnapping special circumstance]).

However, the only felony-murder special circumstance on which the jury was instructed was section 190.2, subdivision (a)(17)(M), intent to kill kidnapping. *That* special circumstance requires intent to kill and cannot be proven by reckless indifference to human life by a major participant in the kidnapping. Thus, in this case, the introductory felony-murder instruction, CALCRIM No. 703, incorrectly told the jury the People could prove either intent to kill *or* reckless indifference to human life if defendant was a major participant in the crime. Because the only felony-murder special circumstance on which the jury was instructed was intent to kill kidnapping, the prosecution was required to prove intent to kill and CALCRIM No. 703 should have been edited accordingly. (*See People v. Cross* (2008) 45 Cal.4th 58, 67 [court may not give instruction inapplicable to the facts of the case].) In fact, No. 703 need not have been

21

given at all since CALCRIM No. 731, pertaining specifically to intent to kill kidnapping, addressed all the requirements of that special circumstance.[14]

2.      *The Instructional Error Was Harmless*

We next consider whether the language of CALCRIM No. 703 that was incorrect because the only felony-murder special circumstance at issue was intent to kill kidnapping, resulted in harmless or prejudicial error.

In determining whether any error was harmless, we " 'conduct a thorough examination of the record.  If, at the end of that examination, [we] cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.' [Citation.]  On the other hand, instructional error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' [Citations.]" (*People v. Mil, supra,* 53 Cal.4th at p. 417.)  Our task is to review "the trial evidence to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element' . . . [Citations.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 666.)

---

[14] The same problem would have occurred under CALJIC instructions.  The CALJIC introductory instruction, No. 8.80.1, states if the defendant is not the actual killer, he or she is not subject to a special circumstances finding unless he or she "with the intent to kill" aided and abetted "the commission of the murder in the first degree" *or* "with reckless indifference to human life and as a major participant" aided and abetted "in the commission of the crime of (Pen. Code, § 190.2(a)(17) crime) which resulted in the death of a human being."  Although this introductory instruction, like CALCRIM No. 703, is meant to be a global statement, it also does not take into account the felony-murder special circumstance set forth in section 190.2, subdivision (a)(17)(M), kidnapping with intent to kill, which is specifically addressed by CALJIC No. 8.81.17.1.  If "kidnapping" were the (a)(17) crime included in the blank in No. 8.80.1, the introductory instruction would incorrectly provide an either/or option as to intent to kill where, as here, the only felony-murder special circumstance at issue was intent to kill kidnapping.  (Boldface omitted.)

We thus look to the record regarding defendant's intent to kill Osby. Our most immediate observation is that the jury found true the torture special circumstance, which required a finding that the defendant "intended to kill Keith Osby." We have also rejected defendant's assertion that there was no substantial evidence she intended to kill Osby while she was participating in his torment. In fact, the evidence that defendant decided Osby should be killed is overwhelming, and we cannot say the record contains evidence that could rationally lead to a contrary finding. (See *People v. Gonzalez, supra,* 54 Cal.4th at p. 666.) Thus, any instructional error was harmless under either the *Chapman* or *Watson* standards. (*Chapman v. California* (1967) 386 U.S. 18; *People v. Watson* (1956) 46 Cal.2d 818.)

C.      *Additional Day of Custody Credit*

Defendant lastly maintains, and the Attorney General concedes, she is entitled to one additional day of presentence custody credit. The record shows defendant was in custody from the date of her arrest on June 22, 2011, until the date of sentencing on November 8, 2013. She is entitled to credit for every day in custody, including the day she was arrested and the day sentence was imposed. (*People v. Black* (2009) 176 Cal.App.4th 145, 154; *People v. Magallanes* (2009) 173 Cal.App.4th 529, 537.) Accordingly, defendant is entitled to 871 days of custody credit, rather than 870 days.

DISPOSITION

The judgment is affirmed except as to custody credits. As to the latter, we direct the trial court to modify the judgment to credit defendant with 871 days of presentence custody credits, prepare an amended abstract of judgment, and forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

_____
Banke, J.

We concur:


_____
Margulies, Acting P. J.


_____
Dondero, J.

A140281, *People v. Odom*

Trial Court:                    Solano County Superior Court

Trial Judge:                    Honorable Wendy Getty

Counsel for Appellant:          Paul Couenhoven, under appointment by the First
                                District Appellate Project

Counsel for Respondent:         Kamala D. Harris, Attorney General,  Gerald A. Engler,
                                Senior Assistant Attorney General, Seth K. Schalit,
                                Supervising Deputy Attorney General, Sharon Wooden,
                                Deputy Attorney General