Filed 2/18/26  P. v. Vasquez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LUIS VASQUEZ,<br><br>    Defendant and Appellant. | B339360<br><br>Los Angeles County<br>Super. Ct. No. VA071398 |

APPEAL from an order of the Superior Court of Los Angeles County, Roger T. Ito, Judge.  Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Luis Vasquez appeals the trial court's denial of his section 1172.6 petition for resentencing.  We affirm.  Undesignated statutory citations are to the Penal Code.

I

Anthony Guzman was a big time drug dealer.  Guzman lived in a rented house on Beverly Road with his girlfriend, Rachel Carrillo.  Mario Montiel also lived in the house.  Carrillo's uncle, Richard Perez, also stayed there occasionally and worked as a broker for Guzman.

Vasquez lived behind the house and came over frequently.  Christopher Price also spent time at the house.

Eli Reyes was a smaller time drug dealer.  Perez introduced Reyes to Guzman as a source of better quality drugs.  Eventually, there was a money dispute between Reyes and Guzman.

The last time Reyes's sister saw him, he was driving a black Honda.  Later that same day, Mary Terhofter was visiting Price at the Beverly Road house.  They were smoking methamphetamine and playing games on PlayStation.  Montiel and Vasquez arrived at the house.  They played darts and Montiel joined Price and Terhofter in smoking methamphetamine.

On a monitor connected to a camera facing the driveway, Terhofter saw a car pull onto the base of the driveway.  Montiel went to the door and told the person to pull the car farther up.  Montiel and Vasquez went outside.  Terhofter heard sounds of fighting, and Price went to the doorway.  Terhofter then saw Montiel, Price, and Vasquez pull something large and struggling, like a person, through the front door.  A loveseat partially blocked Terhofter's view, but she saw the lower legs and feet of a struggling person.

2

Vasquez, Montiel, and Price all stood close together, and Terhofter saw all three make kicking and punching motions. Though she could not see the impacts, Terhofter heard the sound of something being hit.

Someone told Terhofter to go in the kitchen, and she did so. Price came with her but then returned to the living room. Price continued to go back and forth between the two rooms every few minutes.

Terhofter heard all three men's voices. Terhofter heard what was possibly Montiel's voice say, "He shit on himself." And someone replied, "What a fucking pig. Can't he hold it in?" Terhofter also heard someone say, "That will teach you for ripping me off." Terhofter later heard a sound like a bug zapper. After being in the kitchen from somewhere between 45 minutes and three hours, Terhofter went to the bathroom. While there, she heard people moving around in the house, and someone went out the back door. When Terhofter came out, the loveseat had been moved and there was a stun gun on the table.

Carrillo spent most of the night in her room. At one point Price's and Montiel's voices woke her up, and she heard the sound of someone trying to catch his breath. When she came out of her room, Carrillo saw Terhofter and Montiel in the kitchen and Price in the living room. Reyes was lying on the floor in the middle of the hallway and living room, breathing heavily. As Carrillo watched, Price kicked Reyes twice in the head, and Reyes's body hit the wall. Montiel told Carrillo to go back into her room, and she did. When she emerged the next morning, she saw that the living room carpet was gone.

The next morning, as Perez and Guzman arrived at the Beverly Road house, Perez saw Montiel drive away in a black

Honda. Guzman told Perez the house needed to be cleaned. Perez saw the carpet near the door was wet and soapy and had a red tinge. He also saw spots of blood on the wall, the loveseat, near the front door, and in the driveway. He also saw a pool of blood under a truck. When Perez left, part of the carpet had been removed.

Perez heard Price make a stomping motion, and say, "That was fucking crazy, dude." Days later, Montiel told Perez he was covering up loose ends by changing tires and having the receipt backdated. Montiel also told him he put down concrete before installing the new carpet "[s]o that nothing would come up if they ever looked." Montiel also told Perez about digging his fingers into an unnamed person's windpipe until the person's eyes popped out. Montiel mentioned being mad at the other people there for not keeping the attacked person quiet and kicking the attacked person in the face to make him shut up.

Guzman drove Perez to a dump site and told Perez to help a man they met there unload a U-Haul truck. Perez recognized cut up pieces of carpeting from the Beverly Road house among the items being dumped.

A few days after the murder, Reyes's body was found by workers at a construction site in Hermosa Beach. The deputy medical examiner said Reyes's death "was caused by multiple blunt-force injuries," and the body showed injuries consistent with strangulation.

When police searched the Beverly Road house, the living room carpet did not match the carpet in the rest of the house and did not seem professionally installed. There were traces of blood beneath the carpet.

After police arrested him, Vasquez asked his girlfriend during a visit to lie and say he was with her on the night of the murder.

A jury convicted Vasquez, Montiel, and Price of second degree murder. The court of appeal affirmed the sentence of each. (*People v. Vasquez* (April 6, 2006, B173875 [nonpub. opn.].)

Vasquez filed a petition for resentencing under section 1172.6. The trial court appointed counsel and held an evidentiary hearing. Neither side introduced additional evidence. After reviewing the trial transcripts and hearing argument, the trial court ruled Vasquez could still be found guilty of implied malice murder and denied the petition.

Vasquez appeals.

## II

The trial court correctly found Vasquez could still be found guilty of second degree implied malice murder under current law.

The Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) to alter the rules of murder liability to ensure culpability more closely matched punishment. (*People v. Arellano* (2024) 16 Cal.5th 457, 472.)

To provide retroactive relief, Senate Bill 1437 also established a resentencing process, now codified in section 1172.6. This statute permits individuals convicted of murder, attempted murder, or manslaughter under a theory made invalid by the current law to petition the sentencing court to vacate the conviction and seek resentencing. (§ 1172.6, subd. (a).)

At an evidentiary hearing under section 1172.6, subdivision (d), the trial court sits as the independent finder of fact. (*People v. Schell* (2022) 84 Cal.App.5th 437, 442 (*Schell*).) The court must determine in the first instance whether the petitioner could

be found guilty beyond a reasonable doubt on a currently viable theory of murder. (*Ibid.*) We review the trial court's determination for substantial evidence, construing the evidence in the light most favorable to the judgment. (*Ibid.*)

To be guilty of implied malice murder, a defendant must execute an act, the natural consequences of which are dangerous to life, knowing the act endangers the life of another, with conscious disregard for life. (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) To aid or abet an implied malice murder, the aider must intend to aid an act that is dangerous to life, must know the act is dangerous to life, and must act in conscious disregard for human life. (*Reyes*, *supra*, 14 Cal.5th at p. 991.) Thus, the question the court must ask is whether the defendant knew the principal intended to engage in the life-endangering act and intended to aid in that act, despite knowing the act was dangerous to life. (*Id*. at p. 992.)

The testimony showed Vasquez was on the driveway with Montiel when Terhofter heard fighting sounds. Vasquez then assisted Montiel and Price in bringing a resisting person into the house. Terhofter testified the three men were close together around a person on the ground and that all three made kicking and hitting motions. The beating lasted 45 minutes to three hours. During that time, Reyes lost control of his bowels and was groaning and breathing heavily. Assailants tased him with a stun gun. He bled onto the walls and floor. Although Price left and came back, there was no evidence Vasquez ever left. A person that close to the action would understand the serious risk to human life being created. This was sufficient.

Vasquez argues there is not substantial evidence he aided or abetted the life endangering act. He argues there is no direct

evidence he participated in the beating by punching or kicking Reyes or giving words of encouragement. He points out that Terhofter saw punching and kicking motions but did not see his hands or feet strike the body. In other words, he asks us to find that, because Terhofter did not see Vasquez's kicks actually strike the victim, it is reasonable to infer Vasquez was not part of the assault. This is not a reasonable inference. The three men sustained the assault over a period of time and moved together from outside of the house to inside of the house. At no time did Vasquez leave the group as the victim was beaten to death. Even assuming Vasquez did not supply the fatal blow to the victim, he was seen making kicking motions.

Vasquez contends there is no evidence he delivered the blow that ultimately was fatal. This point is inconsequential: delivering the ultimately fatal blow is not an element of this crime. Vasquez intended to aid acts that were dangerous to life. He knew the acts were dangerous to life, and he acted in conscious disregard for human life. That sufficed to support his conviction. (*Reyes*, *supra*, 14 Cal.5th at p. 991.)

Vasquez argues this point distinguishes his case from *People v. Cravens*, where the defendant's blow was the one from which the victim never regained consciousness. (53 Cal.4th 500, 509.) Here, the life-threatening act was a prolonged beating. Vasquez aided that act. Personally dealing the death blow may show an intent to aid in the life-threatening act, but it is not necessary. (*People v. Odom* (2016) 244 Cal.App.4th 237, 249 [even if no evidence defendant had intent to kill before, the severity and duration of beating supported inference she had intent during beating].) Vasquez's continued presence and

7

participation in this prolonged and extreme beating showed his intent to aid the life-endangering act.

Vasquez also argues his case is unlike that of *Schell*. In *Schell*, the defendant engaged in an eight-against-one gang assault that resulted in the victim's death. Schell used his fists and feet, while others in the group had a baseball bat, a shovel, and a knife. (*Schell*, *supra*, 84 Cal.App.5th at p. 441.) The court found Schell was properly convicted of implied malice murder because his participation went beyond mere presence. (*Ibid*.) He kicked and beat the victim while standing shoulder-to-shoulder with men using weapons. (*Ibid*.) Schell was guilty because he knew the attack was likely to end in death. (*Id*. at p. 443.) The use of weapons corroborated Schell's awareness that he was aiding an enterprise dangerous to life.

In this case, Vasquez was aware someone in the group used a stun gun on Reyes. The gruesome and brutal nature of the extended attack corroborated Vasquez's awareness of the risk to Reyes's life.

Vasquez argues that the mere fact he could see Reyes's distress does not establish he had a sufficiently culpable mental state. The only reasonable inference from Terhofter's testimony, however, is that Vasquez also injured Reyes himself.

Finally, Vasquez argues his attempt to create an alibi does not establish his guilt. This evidence was superfluous because the other evidence was conclusive. Whether superfluous evidence was or was not compelling cannot affect Vasquez's conviction.

We grant Vasquez's uncontested request that we take judicial notice of the record in Vasquez's previous appeal.

8

## DISPOSITION

We affirm.

WILEY, J.

We concur:

STRATTON, P. J.

VIRAMONTES, J.