Filed 10/6/22  P. v. Gonzalez CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>OSCAR GONZALEZ,<br><br>　　　Defendant and Appellant. | A165849<br><br>(Fresno County<br>Super. Ct. No. F15901132) |

Defendant Oscar Gonzalez appeals a judgment convicting him of, among other things, the torture and kidnapping of his sister and sentencing him to an aggregate term of life plus nine years in prison. Initially, defendant requests that the judgment be conditionally reversed and the matter remanded to the trial court to allow for a hearing on his eligibility for mental health diversion under Penal Code[1] section 1001.36. Alternatively, he argues the evidence is insufficient to support his torture conviction and he identifies several sentencing errors which he contends must be corrected. In addition, defendant has filed a supplemental brief seeking resentencing under amendments to section 1170, subdivision (b)(6) (Stats. 2021, ch. 731, § 1.3) and section 654 (Stats. 2021, ch. 441, § 1) which took effect during the pendency of this appeal.

---

[1]　　All statutory references are to the Penal Code unless otherwise noted.

1

We conclude that defendant has forfeited his claim for mental health diversion by failing to raise the issue in the trial court and that substantial evidence supports his conviction for torture. We agree that defendant is entitled to a new sentencing hearing under the recent amendments. Accordingly, we will remand for a new sentencing hearing and affirm the judgment in all other respects.

## Background

Defendant was charged by an amended information with attempted murder (count 1; §§ 664, 187, subd. (a)); torture (count 2; § 206); assault by means likely to produce great bodily injury (count 3; § 245, subd. (a)(4)); kidnapping (count 4; § 207, subd. (a)); making criminal threats (count 5; § 422); and false imprisonment by violence (count 6; § 236). As to counts 1, 3, and 4, the information alleged defendant personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)), and personally inflicted great bodily injury (§ 12022.7, subd. (a)). As to counts 5 and 6, the information alleged defendant personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)).[2]

At trial, evidence was presented that defendant, 37 years old at the time of his offenses, and the victim were siblings. The victim, his sister, is approximately four or five years older than defendant. They had another sister who died before the charged crimes were committed and who was a year older than defendant. Defendant and the victim had not had in-person contact for approximately 15 years before the night of the assault but remained in contact over social media.

---

[2]     Defendant's girlfriend, codefendant Shawnessa Hinojosa, was charged with one count of false imprisonment by violence (count 7; § 236) and convicted of the lesser-included offense of false imprisonment.

2

Defendant and the victim met around 3:00 p.m. on the night of the attack. Over the next few hours, the siblings amicably caught up and went to a restaurant for dinner. After dinner, they decided the sister would spend the night at defendant's home. Defendant lived with his girlfriend and her teenage son, both of whom were home when they arrived at defendant's house.

Over the course of the evening, both defendant and his sister drank several beers. The sister testified that she did not believe that defendant was drunk. At approximately 9:00 p.m., defendant and his sister got into a verbal disagreement about the sister's children, who were serving in the United States military. After about 30 minutes, defendant stood and hit his sister in her mouth with a closed fist. Then he shoved her into the bedroom and told her that he was going to kill her, cut her throat, and bury her body in the backyard. He punched her in the mouth a second time, then opened his pocketknife and cut her across the nose. As she lay in a fetal position on the bed, defendant continued to hit and kick her. Defendant told her he was angry because he had his "identity stolen" by their now-deceased sister when they were younger and the victim never tried to help him. The victim testified that she was bleeding from her face while in the bedroom.

Before leaving the bedroom, defendant used duct tape to bind the victim's wrists together. Then, while she was seated on the bed, defendant used his pocketknife to cut her hair and stab her in the head. Again he repeated "over and over again" that the victim did not help him and was not there when he needed her.

The victim testified that defendant's girlfriend entered the room three times while she was being attacked. The third time, the girlfriend told defendant she was going to take her son and leave, because she did not want

him to see what was happening. At that point, defendant forced the victim to walk to the basement. At the bottom of the basement stairs, defendant shoved her and she fell to the ground. Defendant turned on the light and began kicking and stabbing his sister as she lay on the ground in the fetal position. Defendant stabbed and cut the victim's head, arms, and hands. The victim testified, "the more I would cry the more he would start to cut. I had stab wounds on my left arm . . . and on my elbow." She explained further, "So I got stabbed two times here. (Indicating) And again, the more I cried, the more was just -- like he was cutting my fingers. My hands were tied together so I couldn't really do much. So he cut my right hand and wrist with the knife as well. So it was just the more I cried the more he would sit there. He was torturing me the whole time I was down there."

The abuse and threats continued for a period of time in the basement until, for reasons unknown to the victim, defendant suddenly stopped and went up the stairs. When he returned to the basement, he tossed the victim's purse at her and told her to "[g]et her keys and get the fuck out of [his] house." Defendant cut the duct tape off the victim's wrists and told her that if she told the police what happened he would kill himself.

When the victim was away from defendant's home, she called a friend, who picked her up and took her to the hospital. At the hospital, staples were used to close the gash on the back of her head because it was bleeding heavily. Photographs of the victim's injuries, including bruises on her face, the cut on her nose and the lacerations on her head and body, were introduced at trial.

Defendant testified that there was a lot of conflict and abuse in his childhood home but that the victim was his favorite sister growing up and they never fought. He was looking forward to reuniting with her and enjoyed

4

the early part of the evening. As the evening went on, both he and his sister drank a lot of alcohol. He admitted that they got into an argument about the military but denied hitting the victim in the face. He claimed that he told her to leave and followed her into the bedroom when she went to retrieve her belongings.

While in the bedroom, defendant asked his sister about his "stolen identity." He kept pressing her for information until the victim admitted that she knew that their sister had sold his social security number, but never told him. According to defendant, at this point he "lost it" and pulled out his pocketknife. He wanted to cut her hair but she kept putting her hands in the way, so he went into the kitchen and grabbed the duct tape. When he returned to the bedroom, he hit, punched, and kicked his sister. Then he continued cutting off her hair. He testified that he cut her hair to humiliate and degrade her.

Defendant also admitted that he moved his sister to the basement and continued to cut off her hair. He testified, "I was just yelling at her to answer me. And she wouldn't tell me why she knew -- she knew the whole time about my social, but she didn't want to tell me." According to defendant, up to that point, he did not realize she was bleeding because she did not tell him that he had cut her. He thought he was just cutting her hair. He explained that there was just a single lightbulb in the basement, so the light was very dim. After he saw the blood, he knew he had gone "too far," so he cut the duct tape off and told her that he was sorry.

The jury found defendant guilty of counts 2 through 4 and 6 and found all enhancement allegations as to those counts true. The jury found defendant not guilty of count 1 and was not able to reach a verdict on count 5. The trial court sentenced defendant to state prison for life plus nine years.

Defendant timely filed a notice of appeal.

## Discussion

### 1. *Mental Health Diversion*

In June 2018, the Legislature enacted sections 1001.35 and 1001.36 (Stats. 2018, ch. 34, § 24), which created a discretionary pretrial diversion program for defendants with certain mental disorders who may benefit from localized treatment. (§ 1001.36, subd. (b); *People v. Frahs* (2020) 9 Cal.5th 618, 624, 626 (*Frahs*).) In July 2019, at the time of defendant's trial, section 1001.36 gave trial courts discretion to grant pretrial diversion if it found all of the following: (1) the defendant had been diagnosed with a qualifying mental disorder "as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM), including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or PTSD, but excluding antisocial personality disorder, borderline personality disorder, and pedophilia"; (2) the disorder was a significant factor in the commission of the charged offense; (3) in the opinion of a qualified mental health expert, defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment; (4) subject to certain exceptions related to incompetence, the defendant consented to diversion and waived his or her speedy trial rights; (5) the defendant agreed to comply with treatment as a condition of diversion; and (6) the court was satisfied that the defendant would not pose an unreasonable risk of danger to public safety if treated in the community, as defined in section 1170.18. (§ 1001.36, subd. (b)(1); *Frahs, supra,* at pp. 626–627.)

Defendant concedes that despite the availability of the pretrial diversion program at the time of his trial, he did not at any point request the trial court to consider referring him to the program. Nonetheless, he contends

that he should be considered for diversion, and that we should remand this matter to the trial court with directions that it consider the issue. He relies on *Frahs, supra,* 9 Cal.5th at page 626, in which the court held that for cases on appeal that are not yet final, section 1001.36 applies retroactively, and an appellate court may remand a matter for the trial court to consider whether the defendant should be granted pretrial diversion.

The retroactivity of the statute, however, does not excuse defendant's failure to seek diversion in the trial court when he had a meaningful opportunity to do so. A defendant who has the opportunity to seek discretionary relief in the trial court but fails to do so forfeits the right to raise the issue on appeal. (See *People v. Carmony* (2004) 33 Cal.4th 367, 375–376 ["[A]ny failure on the part of a defendant to invite the court to dismiss under section 1385 following [*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497] waives or forfeits his or her right to raise the issue on appeal."]; *People v. Scott* (1994) 9 Cal.4th 331, 352–353 [forfeiture results where a defendant fails to object to a trial court's discretionary sentencing choices].) "All issues . . . are subject to the rule of forfeiture, and a defendant's failure to raise the issue before the trial court will generally result in the appellate court's refusal to consider it." (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347, fn. 9; *People v. Trujillo* (2015) 60 Cal.4th 850, 856 [" ' " ' "[A] constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " ' "].)

Mental health diversion had been available to defendant for over a year before his trial. Yet he never sought to avail himself of the diversionary relief. Section 1001.36 requires a defendant to raise the issue of diversion and "[e]vidence of the defendant's mental disorder shall be provided by the

7

defense and shall include a recent diagnosis by a qualified mental health expert." (§ 1001.36, subd. (b)(1)(A).) Because defendant failed to request mental-health diversion in the trial court, he has forfeited the right to raise the issue for the first time on appeal.

Defendant's alternative argument that trial counsel rendered ineffective assistance by failing to request diversion fares no better. To prevail on an ineffective assistance of counsel claim, defendant must establish that trial counsel's representation fell below professional standards of reasonableness and must affirmatively establish prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436–437.)

Here, a licensed psychologist testified at trial that he had interviewed defendant and diagnosed him as suffering from two disorders contained in DSM-5: major depression, recurrent and substance-induced delirium disorder—namely, alcohol. The doctor also indicated that defendant's mental disorders were connected to the February 21, 2015 incident. There is, however, no evidence that the doctor believed defendant would be amenable to treatment. (§ 1001.36, subd. (b)(1)(E).) Accordingly, there may be a reasonable explanation for trial counsel's failure to raise the issue in the trial court. (*People v. Mai* (2013) 57 Cal.4th 986, 1009 [Reversal on appeal for ineffective assistance is proper "only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission; (2) counsel was asked for a reason and failed to provide one; or (3) there simply could be no satisfactory explanation."].) On the record before us,

8

defendant's claim that he was likely to qualify for diversion and, therefore, prejudiced by the failure to request it is mere speculation that does not, at this juncture, support a finding of ineffective assistance.

### 2. *Torture: Sufficiency of the Evidence*

The crime of torture, as defined by section 206, has two elements: "(1) the infliction of great bodily injury; and (2) the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*People v. Massie* (2006) 142 Cal.App.4th 365, 370–371 (*Massie*).) The record undoubtedly contains substantial evidence to support the jury's finding that defendant inflicted great bodily injury for the purpose of revenge. The lacerations to the victim's head and the bruises on her body support the jury's finding that defendant inflicted great bodily injury. (See § 12022.7, subd. (f) [Great bodily injury means "significant or substantial physical injury."]; *People v. Odom* (2016) 244 Cal.App.4th 237, 247 (*Odom*) [Great bodily injury does not require permanent, disabling, or disfiguring injuries; abrasions, lacerations, and bruising may suffice.].) Defendant's testimony that he cut the victim's hair to "shame" and "insult" her is consistent with a finding that the assaultive acts were committed for the purpose of exacting revenge. Defendant admitted that he was enraged that the victim knew their sister had "stolen his identity"— that is, sold his social security number to another—and acknowledged that throughout the assault, he repeatedly pressed her for information about the subject.

Defendant contends there is insufficient evidence that he acted with the specific intent to cause cruel or extreme pain and suffering. He argues that the evidence shows that he intended to beat the victim, but that he did not intend to cause her extreme physical pain and suffering. He also argues

9

that "[e]xtreme pain and suffering is a far greater level of injury than great bodily injury" and that if he had intended to inflict extreme pain and suffering, "the wounds that would have been inflicted . . . would have been far more severe." We disagree.

The California Supreme Court has clarified that torture requires a specific intent to inflict cruel or extreme "*physical* pain or suffering." (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1047; *People v. Pre* (2004) 117 Cal.App.4th 413, 420 (*Pre*) ["The statutory requirement of an intent to inflict 'cruel' pain and suffering has been interpreted to require that the defendant had an intent to inflict extreme or severe pain."].) The intent to cause cruel or extreme pain "is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*Pre, supra,* at p. 420.) The length of time over which the offense occurred and the severity of any wounds are relevant, but not necessarily determinative. (*Massie, supra*, 142 Cal.App.4th at p. 371.)

Here, there is ample evidence that defendant acted with the intent to cause severe pain. He acknowledges that he repeatedly punched and kicked the victim while in the bedroom and the basement. "Torture . . . does not require a specific modality" and the fact that "great bodily injury was inflicted with 'fists and feet' does not negate the substantial evidence of intent to cause cruel or extreme pain and suffering." (*Odom, supra*, 244 Cal.App.4th at p. 248.) The victim testified that the more she cried, the more he hit her. The reasonable inference is that he meant to increase her pain and suffering in response to her cries.

Defendant's self-serving testimony that he did not know he had cut his sister because the light in the basement was too dim to see the blood was contradicted by the victim's credible testimony that defendant cut her across

10

her nose while in the bedroom and that by the time she left the bedroom she was already bleeding. Defendant's argument also disregards the victim's testimony, which was confirmed in photographs, that defendant stabbed her on her arms and legs as well as her head. Defendant did not need to see blood to know that stabbing someone with a knife would inflict severe pain and suffering.

Finally, we note that in the course of the attack, defendant had the opportunity to reflect and to stop. Rather than do so, he bound the victim's hands with duct tape and later moved her away from other occupants in the house. A reasonable jury could infer from this that defendant's attack was intentional and not an emotional overreaction fueled by alcohol consumption. (See *Odom*, *supra*, 244 Cal.App.4th at p. 247, fn. 8 [" 'Although evidence of binding, by itself, is insufficient to establish an intent to torture [citation], it is appropriate to consider whether the victim was bound and gagged, or was isolated from others.' "]; *Massie, supra*, 142 Cal.App.4th at p. 372 ["The role that anger may have played in a criminal attack is a matter for the jury to determine. In many circumstances, the jury may determine that anger was the reason that the accused formed the intent to inflict injury. There is nothing logically or legally inconsistent in such a determination. On the other hand, if the jury believes the accused acted in such a mindless rage that thought processes were impossible, then it may conclude he did not harbor the intent to inflict injury."].)

Accordingly, there was sufficient evidence to support defendant's conviction for torture.

### 3. *Sentencing Issues*

Defendant was sentenced as follows: The court imposed an indeterminate state prison term of life with the possibility of parole on

11

count 2 (torture). On count 3 (assault by means of force likely to produce great bodily injury), the court imposed the midterm of three years, a three-year term on the section 12022.7, subdivision (a) enhancement and a one-year term on the section 12022, subdivision (b)(1) enhancement, and stayed those terms pursuant to section 654. On count 4 (kidnapping), the court imposed the midterm of five years, a term of three years for the section 12022.7, subdivision (b) enhancement and a term of one year for the section 12022, subdivision (b)(1) enhancement, to run consecutive to the term on count 2. Finally, on count 6 (false imprisonment), the court imposed eight months or one-third the midterm and a one-year term for the section 12022, subdivision (b)(1) enhancement to run consecutive to the term on count 4, but stayed those terms under section 654.

While defendant's appeal was pending, the Legislature amended sections 654 and 1170 to significantly alter a trial court's sentencing discretion. We briefly summarize the relevant amendments:

Section 654 " 'precludes multiple punishments for a single act or indivisible course of conduct.' " (*People v. Pinon* (2016) 6 Cal.App.5th 956, 967.) When a court determines that a conviction falls within the meaning of section 654, the trial court "is required to impose judgment on each count, which involves selecting a term, and then staying execution of the duplicative sentence, the stay to become permanent upon defendant's service of the portion of the sentence not stayed." (*People v. Mani* (2022) 74 Cal.App.5th 343, 380.) At the time of sentencing in this case, section 654, subdivision (a) required the sentencing court to impose the sentence that "provides for the longest potential term of imprisonment" and stay execution of the other term. (§ 654, former subd. (a).) As amended by Assembly Bill No. 518, "section 654 now provides the trial court with discretion to impose and execute the

sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani*, *supra*, at p. 379; see § 654, subd. (a) ["An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (Italics added.)].)

Section 1170, subdivision (b) governs the trial court's discretion when "a judgment of imprisonment is to be imposed and the statute specifies three possible terms." At the time of defendant's sentencing, section 1170, former subdivision (b), provided that the choice between sentencing a defendant to the lower, middle, or upper term "shall rest within the sound discretion of the court," with the court to determine which term "best serves the interests of justice." (§ 1170, former subd. (b).) Pursuant to Senate Bill No. 567, section 1170, subdivision (b)(6) now provides that "[u]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice, the court shall order . . . the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. . . ."

Defendant argues that because these amendments were enacted before his convictions were final and they provide the trial court new discretion to impose a lower sentence, defendant is entitled to their ameliorative benefit. (See *People v. Mani*, *supra*, 74 Cal.App.5th at pp. 379–380, *People v. Garcia* (2022) 76 Cal.App.5th 887, 902.) Defendant argues that "[i]n light of the passage of [Assembly Bill No.] 518 and its amendment of section 654, subdivision (a), the trial court should now exercise its discretion and

13

determine whether to impose and execute the sentence on the shorter term, i.e., the assault, rather than the longer one [torture], as it had done before the change in law." With respect to the amendment of section 1170, subdivision (b), defendant argues that given the evidence of his childhood abuse, the trial court may well impose the lower terms rather than the middle terms on his convictions for assault and kidnapping.

We agree that the amendments apply to defendant's convictions and that remand is appropriate in this case. Generally, " '[d]efendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391), and " 'a court that is unaware of its discretionary authority cannot exercise its informed discretion.' " (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) Nothing in the record clearly indicates that the trial court would have imposed the same sentence under the amended statutes. (See *ibid.* [When " ' "the record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required." ' "].)

Accordingly, we vacate defendant's sentence and remand for a new sentencing hearing.[3] The trial court is entitled in this instance to exercise its full sentencing authority in the first instance. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' "]; *People v. Jones* (2022) 79 Cal.App.5th 37, 46 [Full

---

[3] The parties agree that defendant's conviction for false imprisonment should be vacated because false imprisonment is a lesser included offense of the kidnapping committed in this case. We agree and accordingly, on remand, the court must vacate defendant's conviction on count 6.

resentencing is appropriate where "[a]pplication of the amended statutes will require the trial court, at a minimum, to reconsider which triad term to impose for certain counts of conviction and which terms to stay under section 654."].) Accordingly, we do not address defendant's arguments that section 654 prohibits separate sentences on (1) the torture and kidnapping convictions because the crimes were committed pursuant to a single intent and objective and (2) the great bodily injury enhancement attached to the kidnapping conviction and the torture conviction based on the same injuries. Defendant may raise these arguments in the trial court and the prosecutor may respond as appropriate. On remand, defendant may also make any arguments regarding his ability to pay any fines and assessments imposed by the court and the sufficiency of prison wages to satisfy his financial obligations.

## Disposition

The matter is remanded with directions to vacate defendant's conviction for false imprisonment and conduct a new sentencing hearing. In all other respects, the judgment is affirmed.


POLLAK, P. J.

WE CONCUR:

STREETER, J.
GOLDMAN, J.

15