Filed 6/8/23  P. v. Flores CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079965 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF003636) |
| JOSHUA ARTURO FLORES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher J. Plourd, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Joshua Arturo Flores guilty of first degree murder (Pen. Code, § 187, subd. (a)),[1] with a true finding on the special circumstance allegation that the murder involved the infliction of torture (§ 190.2, subd. (a)(18)).  The trial court sentenced Flores to life in prison without the possibility of parole.

Flores contends (1) the trial court prejudicially erred in overruling an objection to a witness's testimony about a text message sent by Flores; (2) insufficient evidence supports the verdict because the witness who identified Flores as the murderer was an accomplice whose testimony was (a) inadequately corroborated, and (b) inherently improbable; and (3) the true finding on the special circumstance of torture (§ 190.2, subd. (a)(18)) was not supported by substantial evidence because there was an insufficient connection between the torture and the murder.

We conclude that Flores's arguments lack merit, and we accordingly affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of October 1, 2018, Antonio Roldan was killed, and his body was dumped in an irrigation canal in Imperial County. An autopsy showed that Roldan had been stabbed 12 times, with the fatal wounds consisting of a cut to his throat and a stab wound to his chest that punctured his lung.

Flores was prosecuted for Roldan's murder based, in part, on a statement that Angie M. gave authorities, identifying Flores as the person who killed Roldan.

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

2

Angie M. testified that, around the time of the murder, she was using drugs and was working for her friend Monica Lemus to help smuggle undocumented individuals into the United States from Mexico. Some of the activity included "stealing" smuggled individuals from other operators, with the goal of collecting payment when the individuals were delivered to their final destination. Flores also worked in the smuggling operation and was dating Lemus.

On the night of September 30, 2018, Angie M. was with Lemus in the living room of Lemus's house on Fourth Street in Calexico, getting high on methamphetamine. At some point that night, Roldan arrived at the house. Roldan was homeless, but Lemus was letting him stay at the house. Angie M. testified that before she found out that Lemus was letting Roldan stay at the house, Angie M. told Roldan to leave because he was a persona non grata in the gang culture in which she and Lemus were involved. Roldan's diminished standing resulted from the fact that he was known to have "protective custody" status when he was in jail.

Later that night, Flores arrived at the house. Flores called Roldan to the living room, and he and Lemus started questioning Roldan. Angie M. did not know what the questioning was about, but she heard them asking Roldan "did he see anybody and stuff like that." Roldan told Flores and Lemus that "he went inside the house and that he seen two illegals inside the house." Flores and Lemus told Roldan that they did not believe he was telling the truth. Roldan insisted that he was telling the truth. Roldan said that the people in the house had hit him with a chain, and he lifted up his shirt to show the injury. Angie M. inferred from the conversation that since Roldan had lower status in the gang culture, he had to do what he was ordered to do.

Therefore, he may have been sent to a house "to see if there's . . . any people there that they could go pick up."

Flores and Lemus continued to pressure Roldan to tell the truth and then walked him into a bedroom, where they sat him in a chair. Roldan went with them willingly. Flores tried to tie Roldan's legs to the chair. Roldan did not resist, but the ties later came loose. When Roldan continued to say that he was telling the truth, Flores began punching Roldan in the face.

Flores next took out a knife and started stabbing Roldan in the arm. Roldan flinched but did not fight back, saying "Dude, I'm telling you the truth." Flores stabbed Roldan additional times, but Angie M. turned away and did not watch all of the stabbing. Roldan still did not resist. Flores appeared to be "really mad." Angie M. believed that Roldan did not resist because he thought he was only going to be beaten, not killed, and in light of the fact that he "didn't have nowhere to go," he may have thought he would be permitted to stay in the house if he submitted to Flores. Roldan was bleeding and asked to go to the hospital, but Flores refused.

Flores then left the bedroom, and Angie M. told Roldan he should go to the bathroom to shower off the blood. While continuing to say he wanted to go to the hospital, Roldan went into the bathroom, and Angie M. and Lemus went into the living room. Roldan started to make a lot of noise in the shower and then came to the bathroom door and said he could not see. Roldan fell backward and started having a seizure.

After going to see what was happening to Roldan in the bathroom, Angie M. returned to Lemus in the living room, where she spoke with Lemus and asked what they were going to do. According to Angie M.'s testimony, Lemus said to her, " 'Dude,' like, 'what? Like, 'Why?' Like—it didn't—like, it didn't have to—it didn't have to get—like, it didn't have to go to this point.

You know?" Lemus then showed Angie M. a text that Angie M. testified was from Flores. The text said, "I'ma finish him." Angie M. understood the text to mean that Flores was going to kill Roldan.[2]

Flores entered the house and went directly to the bathroom. Angie M. heard "body movement in there." While that was happening, Lemus left the house. Flores walked out of the bathroom holding a knife, which he dropped on the floor. Angie M. went into the bathroom and saw that Roldan's throat had been slit and that the bathroom was "full of blood."[3]

Angie M. helped Flores put Roldan's body into the back seat of Flores's car. Flores then drove away. After Lemus returned to the house, she gave Angie M. money to buy cleaning supplies. To purchase those supplies, Angie M. got a ride to Walmart from another resident of the house, who she believed was in his bedroom during the incident. Angie M. hid the knife that Flores used to kill Roldan by driving to "where the fields are at in back of Walmart."[4] Angie M. returned to the house and cleaned the bathroom.

Roldan's body was found on October 1, 2018, at the bottom of an irrigation canal.

---

[2]    Although Angie M. testified about the text message's content, the text message itself was not recovered and thus was not available as evidence.

[3]    The autopsy showed that there were two fatal wounds: a slit to Roldan's throat and a stab wound that punctured his lung. It was not clear from the evidence presented at trial whether the fatal stab wound to Roldan's lung was inflicted during Flores's initial round of stabbing Roldan in the bedroom or during Flores's subsequent assault on Roldan in the bathroom.

[4]    Law enforcement later searched for the knife but did not locate it.

An information charged Flores with the murder of Roldan (§ 187, subd. (a)), with the further allegation that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)).

At trial, the People presented evidence of the location of Flores's cell phone during the early morning hours of October 1, 2018. The phone registered as being within 200 meters of Lemus's house at 12:37 a.m., 1:08 a.m., and 1:27 a.m. At 1:42 a.m. and 1:45 a.m., the phone registered as being near the location where Roldan's body was discovered. The phone was used many times between midnight and 4:00 a.m. on October 1, 2018, with both incoming and outgoing texts and calls. The six phone numbers associated with those texts and calls were numbers that Flores regularly contacted in the prior month. Many of the text messages that Flores sent in the early morning hours of October 1, 2018, had been deleted by the time the People attempted to recover them.

The People also presented evidence of two locations where traces of Roldan's blood were discovered. First, Roldan's blood was found behind the baseboard in the bathroom of Lemus's house. Second, Roldan's blood was found in Flores's car. The car itself was located in a large vacant lot, and it had been stripped of its seats, carpet, and upholstery.

Flores testified in his own defense. He denied being involved in Roldan's murder. Flores explained that on the night of the murder, he rented out his car to someone who worked in the same smuggling operation. He left his cell phone in his car, either because (1) it fell out of his pocket, or (2) he intended to leave a different cell phone in the car to track the location of his car but mistakenly left his personal cell phone. Flores testified that his car ended up in the vacant lot because it was vandalized while parked at a friend's mobile home park, so he asked someone to move it to a different

6

location, where it was apparently stripped without his knowledge. Flores did not know why Angie M. lied about his involvement in Roldan's murder, but he thought Angie M. may have been jealous of his relationship with Lemus. Flores testified that Roldan was a friend with whom he had grown up and with whom he had worked in a smuggling operation several years earlier. Flores also admitted to having beaten Roldan a couple of weeks before Roldan's death.

During closing argument, defense counsel argued that Angie M.'s identification of Flores as the person who murdered Roldan was not credible because, among other things, "she was in a methamphetamine psychosis" during the relevant events.

The jury found Flores guilty of first degree murder (§ 187, subd. (a)), and made a true finding on the torture special circumstance (§ 190.2, subd. (a)(18)). Flores was sentenced to a term of life in prison without the possibility of parole.

II.

DISCUSSION

A.  *The Trial Court Did Not Abuse Its Discretion in Overruling the Objection to Angie M.'s Testimony About Flores's Text Message*

Flores's first contention is that the trial court prejudicially erred in overruling defense counsel's objection to Angie M.'s testimony about the text message from Flores that Lemus showed to her.

We begin our analysis with a review of the relevant proceedings. Regarding Angie M.'s testimony about her interaction with Lemus in the living room, the reporter's transcript reflects the following:

> "[ANGIE M.:]  [Lemus]—at first, she was, like, 'Dude,' like, 'what?'  Like, 'Why?'  Like—it didn't—like, it didn't have to—it didn't have to get—like, it didn't have to go to this point.  You

7

know?  [¶]  And then she showed me a text that he send—that he sent her.

"[PROSECUTOR:]  Okay.  Wait.  [¶]  [Lemus] showed you a text on her phone?

"[ANGIE M.:]  Uh-huh.

"[PROSECUTOR:]  Is that right?

"[ANGIE M.:]  Yeah.

"[PROSECUTOR:]  And did she tell you that—when you say 'he' sent it, who?  Who's 'he'?

"[ANGIE M.:]  [Flores].

"[PROSECUTOR:]  And did she tell you that [Flores] sent it?

"[DEFENSE COUNSEL:]  Objection.  Can we approach?

"THE COURT:  We'll note—what's your legal basis for your objection?

"[DEFENSE COUNSEL:]  Hearsay.

"THE COURT:  Overruled.

"BY [PROSECUTOR]:  And what did the text say?

"[ANGIE M.:]  She showed me the text.  It said, 'I'ma finish him.' "

At a break in the proceedings, the trial court allowed defense counsel to make a record about his objection to Angie M.'s testimony regarding the text message.  Defense counsel stated, "[Angie M.] . . . is telling us hearsay what Monica Lemus said.  And there's a problem with authentication.  It is certainly a hearsay statement, and it's not really verified.  I don't think it's

8

admissible." After hearing from the prosecutor, the trial court overruled the objection. The trial court explained, "I think [it] comes in under [a] coconspirator-type rationale as well as it explains subsequent conduct. And it's authenticated by the subsequent actions and observations of the witness. So . . . it comes in for several different purposes—some not hearsay, some for the truth of the matter. What was his intent or state of mind at the time." Defense counsel then asked for a limiting instruction "[i]f it comes in not for the truth of the matter." The trial court rejected the request, explaining that the evidence was coming in for the truth of the matter.

" 'We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion.' " (*People v. Henriquez* (2017) 4 Cal.5th 1, 31.) " ' "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 26.) Moreover, on our review, the question is whether the evidence was properly admitted, not whether the trial court identified the correct basis for admitting it. "If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below." (*People v. Brown* (2004) 33 Cal.4th 892, 901.)

To analyze Flores's challenge to the trial court's overruling of his objection, it is first important to understand the scope of that objection. The objection raised by defense counsel during Angie M.'s testimony was clearly only as to a *single* question asked by the prosecutor. Specifically, defense counsel objected to the question, "And did she tell you that [Flores] sent it?," which referred to the text message that Lemus showed Angie M. Defense

counsel immediately specified that his objection was based on hearsay, presumably because the question called for Angie M. to relate an out-of-court statement made by Lemus. The trial court overruled the objection. Significantly, however, the prosecutor did not ask the question again or direct Angie M. to answer the question that had already been posed. Instead, without ever obtaining an answer to the question of whether Lemus said that Flores sent the text message, the prosecutor moved on to a *new* question. Specifically, the prosecutor asked, "And what did the text say?" Defense counsel made no objection to that question, and Angie M. answered by relating the content of the text message Lemus showed her.

Defense counsel's later statements to the trial court, in which he explained the basis for his objection, are somewhat confusing. Without the context set forth above, defense counsel's statements might be interpreted as touching on *additional* parts of Angie M.'s testimony regarding the text message, such as her description of its contents, her description of it being from Flores, or her description of the statements that Lemus made *before* bringing up the text message. Flores's appellate brief paints with a broad brush by challenging the admissibility of *everything* that Angie M. testified to about the text message.[5] Significantly, however, defense counsel made no objection to anything other than the question that called for Angie M. to say

<hr>

[5] For example, Flores's reply brief summarizes his intention to challenge the admissibility of *all* of the testimony that Angie M. gave regarding the text message, including Angie M.'s description of what Lemus said before she brought up the subject of the text message. Flores contends that the trial court erred "by admitting for the truth of the matter and without a limiting instruction, through the testimony of [Angie M.], the content of a text message and identity of Flores as the sender of the message along with the hearsay of a non-testifying accomplice's statements [i.e., Lemus's statements] objecting to the plan."

whether Lemus *told her* that Flores sent the text message.  Specifically, defense counsel made no objection to the following testimony by Angie M.: "[A]t first, [Lemus] was, like, 'Dude,' like, 'what?'  Like, 'Why?'  Like—it didn't—like, it didn't have to—it didn't have to get—like, it didn't have to go to this point.  You know? [¶]  And then she showed me a text that he send— that he sent her."  Defense counsel also made no objection when the prosecutor asked Angie M. to clarify *who* she was referring to as having sent the text message, to which Angie M. answered that it was Flores.  Finally, defense counsel made no objection when Angie M. recounted the *content* of the text message that she looked at:  "She showed me the text.  It said, 'I'ma finish him.' "

To preserve an evidentiary challenge for appeal, counsel must raise an objection in the trial court that is "so stated as to make clear the specific ground of the objection."  (Evid. Code, § 353, subd (a); see also *People v. Rundle* (2008) 43 Cal.4th 76, 116.)  Thus, the only objection preserved by defense counsel was the objection to the question of whether Lemus told Angie M. that Flores sent the text message.  Our task on appeal is accordingly limited to deciding only whether the trial court abused its discretion in overruling the objection to the question, "And did she tell you that [Flores] sent it?"

Turning to that single task, we need not, and do not, decide whether the trial court abused its discretion in overruling defense counsel's objection. Even assuming the ruling *was* erroneous, it was indisputably harmless under any standard because the prosecutor did not prompt Angie M. to give an answer after defense counsel's objection was overruled.  Because Angie M. did not answer the question, the jury did not find out, and we still do not know, whether Lemus *did* tell Angie M. that the text message was from Flores.  Put

11

simply, because no evidence was admitted as a result of the trial court's decision to overrule defense counsel's objection, the ruling could not have been prejudicial.

Flores tries to expand the scope of defense counsel's objection by focusing on defense counsel's later statement to the trial court that he believed there was "a problem with authentication." Specifically, in his later comments to the trial court, defense counsel said, "And there's a problem with *authentication*. It is certainly a hearsay statement, *and it's not really verified*." (Italics added.) Flores contends that defense counsel must have meant to say there was "a problem with *foundation*," and accordingly defense counsel was asserting an objection to "the admission of [Angie M.'s] testimony about *the content* of the text message as hearsay without proper foundation and authentication." (Italics added.)

We reject Flores's characterization of defense counsel's objection. As we have explained, during Angie M.'s testimony defense counsel clearly made *no objection* to Angie M.'s description of the text message's *content*. His sole objection was to the question calling on Angie M. to state whether Lemus identified Flores as the person who sent the text. In that context, when he stated there was "a problem with authentication," defense counsel could not have been *elaborating* on an objection directed to Angie M.'s testimony about the content of the text message.

Flores points out that the prosecutor failed to elicit testimony that would have established whether Angie M. was able to tell, by looking at Lemus's phone, that the text message Lemus showed her was sent by Flores. According to Flores, without such testimony there was no "foundation" to allow Angie M. to testify about the content of the text message and to describe it as having been sent by Flores. Importantly, however, defense

counsel made no objection to Angie M.'s testimony about the content of the text message or to her statement that Flores was the person who sent it. Had defense counsel interposed an objection, the prosecutor would have been on notice that she should follow up with Angie M. about whether it was apparent to her, from looking at the screen of Lemus's phone, that the text message was from Flores. Having not made a timely objection, Flores may not now, on appeal, argue that the prosecutor failed to elicit sufficient testimony to support the admissibility of Angie M.'s testimony.

Flores also argues that, to the extent the evidence to which he objected was admitted for a nonhearsay purpose, the trial court should have granted his request for a limiting instruction. (Evid. Code, § 355 ["When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."].) However, because the jury did not hear any testimony in response to the question to which defense counsel objected, including any evidence admitted for a nonhearsay purpose, there was no evidence that would need to be addressed by a limiting instruction.

B.    *Flores's Challenge to the Sufficiency of the Evidence*

We next consider Flores's challenge to the sufficiency of the evidence to support a finding that Flores killed Roldan in a first degree murder. Flores presents two separate arguments as to the sufficiency of the evidence. First, he contends that we may not consider Angie M.'s testimony in support of the verdict because Angie M. was an accomplice whose testimony was not sufficiently corroborated. Second, Flores argues that even if Angie M.'s testimony was adequately corroborated, we should reject it as inherently improbable. We address each argument in turn.

13

1. *Angie M.'s Testimony Was Sufficiently Corroborated*

Under section 1111, "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." "This statute reflects the Legislature's determination that ' "because of the reliability questions posed by" ' accomplice testimony, such testimony ' "by itself is insufficient as a matter of law to support a conviction." ' " (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128 (*Rodriguez*).)

The People do not dispute that Angie M. qualifies as an accomplice, and the jury was so instructed.[6] Thus, we may not consider Angie M.'s testimony in assessing the sufficiency of the evidence to support the verdict *unless* that testimony was corroborated by other evidence within the meaning of section 1111.

Our Supreme Court has "interpreted section 1111 to require 'evidence tending to connect [the] defendant with the crimes "without aid or assistance from the testimony of" ' the accomplice. . . . [E]vidence corroborating accomplice testimony ' "need not independently establish the identity of the victim's assailant" [citation], nor corroborate every fact to which the accomplice testifies [citation], and " 'may be circumstantial or slight and entitled to little consideration when standing alone.' " ' . . . But the evidence

---

6    Section 1111 defines "[a]n accomplice . . . as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." As the People do not challenge the description of Angie M. as an accomplice, we need not, and do not, consider whether the record contains factual support for that description.

must nonetheless connect the defendant to the crime itself, rather than simply connect the accomplice to the crime." (*People v. Perez* (2018) 4 Cal.5th 421, 452 (*Perez*).) "[T]he corroboration must connect the defendant to the crime *independent* of the accomplice's testimony" (*People v. Romero and Self* (2015) 62 Cal.4th 1, 36), but " ' "[t]he corroborating evidence need not by itself establish every element of the crime" ' " (*People v. Gomez* (2018) 6 Cal.5th 243, 308). " ' "The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration." ' " (*Rodriguez, supra*, 4 Cal.5th at p. 1128.)

Thus, for example, in *Perez*, an accomplice's testimony was sufficiently corroborated when the evidence (1) placed the defendant near the scene of the robbery and murder during the relevant timeframe; (2) showed that the defendant tried to sell stolen property from the crime scene immediately afterwards; and (3) showed that a vehicle taken from the crime scene was abandoned near where the defendant checked into a motel. (*Perez, supra*, 4 Cal.5th at p. 453.) Although that evidence "did not 'corroborate every fact to which the accomplice testifie[d]' and could perhaps be characterized as 'circumstantial or slight and entitled to little consideration when standing alone,' it tend[ed] to connect [the defendant] to much of the narrative established by [the accomplice's] testimony." (*Ibid*.)

Here, ample evidence provides corroboration that connects Flores to the murder of Roldan, independent of Angie M.'s testimony. Among other things, the blood evidence supports Angie M.'s testimony that the murder took place at Lemus's house, and other evidence established that Flores's cell phone was in that vicinity during the relevant time frame and at the location where Roldan's body was found. Further, Roldan's blood was found in Flores's car.

15

This evidence tends to connect Flores with Roldan's murder " ' "without aid or assistance from the testimony of" ' " Angie M. (*Perez, supra,* 4 Cal.5th at p. 452.) We therefore reject Flores's contention that we should not consider Angie M.'s testimony in assessing the sufficiency of the evidence.

2. *Because Angie M.'s Testimony Was Not Inherently Improbable, It Provides Substantial Evidence to Support a Finding That Flores Murdered Roldan*

Flores contends that even if we determine there was adequate corroboration for Angie M.'s testimony, we should nevertheless conclude that insufficient evidence supports the verdict because Angie M.'s testimony was "inherently improbable."

" ' "In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility." ' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117-1118.) "[U]nless the testimony is *physically impossible or inherently improbable*, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181, italics added.)

16

" ' "Although an appellate court will not uphold a judgment or verdict based upon evidence *inherently improbable*, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by [the trier of fact], *there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.* [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 519 (*Maciel*), italics added.) "The inherently improbable standard addresses the basic content of the testimony itself—i.e., could that have happened?—rather than the apparent credibility of the person testifying. . . . In other words, the challenged evidence must be improbable ' "on its face" ' . . . . The only question is: Does it seem *possible* that what the witness claimed to have happened actually happened?" (*People v. Ennis* (2010) 190 Cal.App.4th 721, 729.)

Flores argues that Angie M.'s "recount of the incident was fraught with improbabilities." According to Flores, "it is highly improbable that an unrestrained man, who was bigger than Flores, would simply sit in a chair allowing Flores to punch him in the face and repeatedly stab him without any attempt to fight back or protect himself from injury," or that Roldan "did not make sufficient noise to cause one of Lemus'[s] housemates, who was in the adjacent bedroom to hear and come out." Flores also contends it is improbable that "Flores walked directly into the bathroom and slit Roldan's throat . . . yet there was no scream, yelling, or other noise other than 'body

17

movement.' " Finally, pointing to other evidence that seems to be inconsistent with Angie M.'s account, Flores contends (1) it is improbable that Angie M. hid the knife in a field behind Walmart because law enforcement did not find the knife during a subsequent search; and (2) it is improbable that Flores would have stabbed Roldan "to extort the 'truth,' " since Angie M. described Roldan as raising his shirt to show Flores that he had been hit with a chain.

None of these items satisfy the definition of inherently improbable testimony. Angie M's testimony does not describe any " ' "physical impossibility." ' " (*Maciel, supra*, 57 Cal.4th at p. 519.) Nor is its " ' "falsity . . . apparent without resorting to inferences or deductions." ' " (*Ibid*.) Instead, Flores's argument amounts, in substance, to a claim that Angie M.'s account of the incident was not credible for various reasons. But testimony that lacks credibility is not the same as testimony that is inherently improbable. (*Ibid*.)

We further find Flores's argument to be unpersuasive because the record reveals perfectly reasonable explanations for much of the testimony that Flores describes as inherently improbable. Flores contends it is improbable that Roldan would have submitted to Flores's assault without fighting back. However, Angie M. testified that because Roldan had low status in the gang culture and was homeless, he may have submitted to Flores so he would be able to stay in the house. Angie M. also explained that there was a good reason why Lemus's housemate stayed in his bedroom during the incident. As Angie M. testified, the housemate was a field worker who might not have had "papers" and thus would not want to get involved. In addition, because Roldan had already passed out and was having a seizure, it is completely reasonable that Angie M. did not hear any screams or

18

yelling coming from Roldan in the bathroom when Flores slit Roldan's throat.[7]

The purportedly inconsistent evidence identified by Flores also does not create any inherent improbability in Angie M.'s testimony. First, the inability of law enforcement to locate the knife Flores used to kill Roldan does not conclusively prove the falsity of Angie M.'s contention that she hid the knife in the fields behind Walmart. This is especially true because there was minimal evidence at trial about (1) the exact location where Angie M. hid the knife; (2) what Angie M. disclosed to law enforcement about the knife's location; and (3) when and where law enforcement personnel conducted their search for the knife. Second, Angie M.'s testimony that Roldan lifted his shirt to prove he had been hit with a chain does not render it improbable that Flores would have continued to stab Roldan to get him to tell the truth. Flores could have thought that Roldan was being dishonest about any number of things that had nothing to do with whether or not Roldan had been hit with a chain, or Flores may not have believed Roldan about the cause of his injuries.

As there is no merit to Flores's contention that we should disregard Angie M.'s testimony as inherently improbable, there is ample evidence to support a finding that Flores killed Roldan. Angie M.'s corroborated and detailed testimony was more than sufficient to support a finding that Flores committed first degree murder.

---

[7] Indeed, in connection with a different argument in his appellate brief, Flores states that the evidence "provides a reasonable inference that Roldan was not conscious when the fatal wounds were inflicted."

C. *Flores's Challenge to the True Finding on the Torture Special Circumstance Lacks Merit*

Finally, Flores challenges the jury's true finding on the special circumstance allegation that Roldan's murder involved the infliction of torture. (§ 190.2, subd. (a)(18).) Specifically, arguing that there was "a gap in time" between his torturous stabbing of Roldan and the murder, and that he had separate intents during the two time periods, Flores contends that the evidence is insufficient to support a true finding on the special circumstance.[8]

The special circumstance of torture set forth in section 190.2, subdivision (a)(18) authorizes a prison term of life without the possibility of parole if "[t]he murder was intentional and involved the infliction of torture." (§ 190.2, subd. (a)(18).) "Proof of a murder committed under the torture-murder special circumstance requires (1) proof of first degree murder, (2) proof that the defendant intended to kill and torture the victim, and (3) proof of the infliction of an extremely painful act upon a living victim." (*People v. Jennings* (2010) 50 Cal.4th 616, 647.) It applies "where the death involved the infliction of torture, regardless of whether the acts constituting the torture were the *cause* of death." (*Ibid.*, italics added.) Instead of a causal connection between the act of torture and the victim's death, section 190.2, subdivision (a)(18) "requires 'some proximity in time [and] space between the murder and torture.' . . . The statute obviously does not

---

8    Flores does not dispute the jury's finding that the act of repeatedly stabbing Roldan to get him to tell the truth and then refusing his request for medical attention satisfies the definition of torture under section 190.2, subdivision (a)(18). Specifically, a finding of torture under that provision "requires an ' "intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose." ' " (*People v. Edwards* (2013) 57 Cal.4th 658, 718.)

apply where 'no connection' between the two events appears." (*People v. Bemore* (2000) 22 Cal.4th 809, 843 (*Bemore*).) "[T]orture can consist of a course of conduct[,] and the intent to kill need not be conjoined with every act within that continuum." (*People v. Odom* (2016) 244 Cal.App.4th 237, 250.) The Legislature "intended to encompass (within the torture-murder special circumstance) acts of torture occurring *within a larger time frame*, including those that would not have caused death." (*People v. Crittenden* (1994) 9 Cal.4th 83, 142 (*Crittenden*), italics added.)

Case law from our Supreme Court demonstrates the type of temporally attenuated connection between the act of torture and the act of murder that is sufficient to support a special circumstance true finding. In *People v. Barnett* (1998) 17 Cal.4th 1044, the victim was first "torturously nicked and stabbed" by the defendant. (*Id*. at p. 1162.) The evidence suggested that the defendant then left the scene, leaving the victim "tethered to a tree to suffer from his injuries," but the defendant later returned and fatally stabbed the victim. (*Ibid*.) Our Supreme Court held that the defendant's act of leaving and then returning to inflict the fatal stab wounds "was not sufficient to separate the torture from the murder." (*Ibid*.) The connection between the torture and the murder was also sufficient in *Bemore*, where, in the course of a robbery, the defendant tortured the victim by repeatedly stabbing him to try to get him to open a safe, and then inflicted fatal wounds at the end of the robbery because the victim was a witness. (*Bemore, supra,* 22 Cal.4th at pp. 842-844.)

In challenging the sufficiency of the evidence to support the true finding on the torture special circumstance, Flores focuses on Angie M.'s testimony that after he punched and stabbed Roldan, he briefly left the house while Roldan was in the shower, sent a text to Lemus, and then returned to

21

inflict the fatal wounds on Roldan.  Based on this scenario, he argues that "[b]ecause the record here reflects the stabbing act relied upon by the prosecution to prove torture was temporally separate from the murder, with each act having separate intents, the evidence was insufficient to support a finding that the murder was committed by torture."  He contends that "the evidence presented at trial was insufficient to prove Flores had the requisite intent to kill at the time acts relied upon to prove torture were committed and/or had tortu[r]ous intent at the time of the killing."

Flores's argument appears to be premised on a misunderstanding of the applicable legal standard.  The relevant case law has never required that the defendant formulate an intent to kill at precisely the same time that he is carrying out the acts constituting torture.  Instead, the intent to kill and the infliction of torture need only have " 'some proximity in time [and] space.' " (*Bemore, supra*, 22 Cal.4th at p. 843.)  The torture may occur *within a larger time frame* than the murder itself.  (*Crittenden, supra*, 9 Cal.4th at p. 142, italics added.)  There need only be a " 'connection' between the two events." (*Bemore*, at p. 843.)

Here, substantial evidence supports a finding that Flores inflicted torture upon Roldan in a time frame that was sufficiently proximate to Flores's act of intentionally killing Roldan.  A reasonable trier of fact could conclude that the entire incident took place as a continuous transaction in which Flores cruelly punched and stabbed Roldan, refused Roldan's request for medical attention, left Roldan to bleed out for a short period of time, and then killed Roldan with additional knife wounds.  The torture and the murder, which took place in the same location and within a few minutes of each other, were sufficiently connected in both " 'time [and] space,' " as required by our Supreme Court's case law.  (*Bemore, supra*, 22 Cal.4th at

22

p. 843.)  Flores's challenge to the sufficiency of the evidence to support the jury's true finding on the torture special circumstance accordingly lacks merit.

DISPOSITION

The judgment is affirmed.


IRION, Acting P. J.

WE CONCUR:



DATO, J.



BUCHANAN, J.